IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 19, 2016

**STATE OF TENNESSEE v. LADON ANTOINE DOAK**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2013-A-891     Steve R. Dozier, Judge**

_____

**No. M2015-01454-CCA-R3-CD – Filed August 22, 2016**

_____

The appellant, Ladon Antoine Doak, was convicted in the Davidson County Criminal Court of aggravated robbery, a Class B felony, and aggravated burglary, a Class C felony, and the trial court sentenced him to concurrent sentences of fifteen and eight years, respectively.  On appeal, the appellant contends that the evidence is insufficient to support the convictions.  Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Jay Allen Umerley (on appeal) and Jack Byrd (at trial), Nashville, Tennessee, for the appellant, Ladon Antoine Doak.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In March 2013, the Davidson County Grand Jury indicted the appellant and Robreka Sullivan for the aggravated robbery of Ishabeka Williams, the aggravated

burglary of Ms. Williams's home, and the aggravated assaults of Shanelle Jones and Charmaine Peters. The defendants were tried jointly.

At trial, Ishabeka Williams testified that in January 2013, she lived in an apartment on 11th Avenue North in Nashville and that Charmaine Peters lived in the apartment next door. On January 17, Shanelle Jones, who was a friend of Ms. Williams and Ms. Peters, came to Ms. Williams's apartment. The appellant was with Ms. Jones, and Ms. Jones claimed that the appellant was her brother. Ms. Williams said that she, Ms. Jones, and the appellant sat in her living room and talked and that the appellant asked her to "take him to rob his . . . [girlfriend's] baby daddy." However, Ms. Williams "wasn't interested in doing that" and "changed the subject." Later that night, Ms. Jones and the appellant knocked on Ms. Williams's door, and Ms. Jones asked Ms. Williams to drive them to Dodge City. Ms. Williams had never met the appellant prior to January 17 and felt uncomfortable with the situation, so she asked her aunt to ride with her "to drop them off." Ms. Williams and her aunt drove Ms. Jones and the appellant to Dodge City about 11:00 p.m.

Ms. Williams testified that the next day, Ms. Jones came back to her apartment. Ms. Jones told Ms. Williams that Ms. Jones and the appellant "had had words the night before" and that the appellant was looking for Ms. Jones. Ms. Williams heard a knock on her front door and answered it. The appellant and Robreka Sullivan were at the door and wanted to know where Ms. Jones was located. Ms. Williams said she tried to "cover" for Ms. Jones and told them Ms. Jones was not there. Ms. Williams said Sullivan was "like clutching for a gun; like she kind of had her hand on it." Ms. Williams did not let them into her apartment and watched them walk down the street.

Ms. Williams testified that a few minutes later, Ms. Jones went to Ms. Williams's aunt's apartment to get something for Ms. Williams. When Ms. Jones returned, she did not lock the front door. Ms. Williams said that the door opened and that she saw Sullivan run into the hallway. Sullivan had a gun in her hand, and the appellant came in behind Sullivan. Ms. Williams tried to escape out the back door, but Sullivan hit her with the gun. Ms. Williams stated that Sullivan kept asking for money, guns, and "dope" and that she asked Sullivan, "[W]hat are you talking about?" Ms. Williams said the appellant went through the apartment, "looking for stuff." When he did not find any guns or drugs, he "just started picking up random stuff." The appellant took Ms. Williams's cellular telephone, televisions, and computers and told Ms. Jones and Ms. Peters to load all of the items into Ms. Williams's Ford Explorer. When the items were in the vehicle, the appellant and Sullivan left in the Explorer.

Ms. Williams testified that she telephoned the police immediately and that the police found the appellant and Sullivan on the street in Dodge City where she had

dropped them off the previous night. The police also found her Explorer. The police took Ms. Williams to the police department and showed the appellant and Sullivan to her, and she identified them as the robbers. She said that during the robbery, the appellant and Sullivan passed the gun to each other "I think twice." She described the gun as chrome with a wood handle and said the appellant pointed the gun at her a couple of times but never hit her with it. Sullivan, though, hit Ms. Williams with the gun five or six times, and Ms. Williams's head was "cut open." Sullivan told Ms. Williams that she should kill Ms. Williams. Ms. Williams said that she did not have a gun during the incident and that she was scared for her life. She identified photographs of her apartment taken after the robbery.[1]

On cross-examination, Ms. Williams testified that the appellant did not force Ms. Jones or Ms. Peters to put her property into the Explorer. After the appellant and Sullivan left in the vehicle, Ms. Jones "kind of met them at the corner." Ms. Williams did not know where Ms. Peters went. Ms. Williams later spoke with Ms. Peters, and Ms. Peters claimed she was innocent but knew the robbery was going to occur. Ms. Williams asked Ms. Peters why Ms. Peters did not warn her, and Ms. Peters said she was scared to tell Ms. Williams because Sullivan and the appellant "were already there."

Ms. Williams denied having a gun in her apartment at the time of the robbery or taking a gun out of her apartment after the robbery. She stated, "If [there] was a gun in my house, as much as he tore it up, they would've found it." She acknowledged that she may have stated at the defendants' preliminary hearing that the only items the appellant took were two flat screen televisions and an old cellular telephone. She said that she was "still kind of devastated and shocked about the whole situation" at the time of the hearing and that she "possibly [did] not put everything in." She also acknowledged that she did not tell the police that the appellant took computers. However, she did not know the appellant had taken the computers when she spoke with the police. Ms. Williams said she had prior convictions for theft, that she used to have a "theft problem," and that she was "getting help with it."

Officer Steven Weir of the Metropolitan Nashville Police Department (MNPD) testified that on the afternoon of January 18, 2013, he and Officer Edward Draves responded to a robbery on 11th Avenue North. The officers traveled toward Cumberland View and saw the appellant and Sullivan walking toward Clarksville Pike. They noticed that the appellant and Sullivan matched the descriptions of the two suspects, exited their police vehicle, and approached them. Officer Weir searched Sullivan and found Ms. Williams's wallet in one of Sullivan's sleeves. He also found a cellular telephone and a

---

[1] The exhibits introduced into evidence at trial are not in the appellate record.

handgun on Sullivan. A magazine was in the gun. Officer Weir said that a lot of blood was on Sullivan's jacket and that he arrested her.

Officer Edward Draves testified that he and Officer Weir saw the appellant and Sullivan walking after the robbery call and approached them. Officer Draves patted down the appellant and heard Officer Weir say, "[G]un." Officer Draves immediately handcuffed the appellant. He said that Ms. Williams's car keys were in the appellant's coat pocket and that a television remote control was in the appellant's pants pocket, "which seemed odd." The officers transported Sullivan to the police department, and another officer transported the appellant. Officer Draves said that the gun found by Officer Weir was a nine-millimeter handgun.

On cross-examination, Officer Draves testified that the appellant and Sullivan were just one block from Ms. Williams's apartment when the officers spotted them. He said the gun was loaded with nine-millimeter bullets. He acknowledged that he said the bullets were .380 caliber in his report and stated that he "put in the wrong caliber when he typed up the report."

Officer Gary Shannon of the MNPD testified that on the afternoon of January 18, 2013, he "headed toward the Dodge City area of north Nashville." When he arrived at the scene, Officers Weir and Draves had already arrested the appellant and Sullivan. A gold Ford Explorer was parked in an alleyway, and electronics, including televisions and laptop computers, were in the vehicle.

Sharon Tilley, a crime scene technician with the MNPD, testified that she arrived at Ms. Williams's apartment about 5:10 p.m. on January 18, 2013. She photographed Ms. Williams and dusted items for fingerprints. Ms. Williams had a cut over her right eye, and areas of her apartment had been ransacked.

Sergeant George Ward of the MNPD testified that on January 18, 2013, he was dispatched to 23rd Avenue North. A vehicle was in an alley, and he photographed the vehicle and processed it for fingerprints. He also processed televisions and laptop computers in the vehicle for fingerprints.

Linda Wilson, a police identification analyst for the MNPD, testified as an expert in fingerprint analysis that she compared latent fingerprints collected by Ms. Tilley and Sergeant Ward to known fingerprints. Regarding the prints collected by Ms. Tilley, Ms. Wilson was unable to match them to anyone. As to the latent fingerprints collected by Sergeant Ward, Ms. Wilson found Williams's prints on the exterior of the Explorer's driver's door, a Sony television, a Philips television, and the rearview mirror. The appellant's palm print was on a Sony television. On cross-examination, Ms. Wilson

acknowledged that none of the prints collected by Ms. Tilley or Sergeant Ward matched Sullivan.

Shanelle Jones testified for the appellant that she put one television into the Explorer during the robbery. After the robbery, Ms. Williams took a gun out of a closet and walked behind her apartment with it. Ms. Jones left Ms. Williams's apartment, went to a bus stop, and did not know what Ms. Williams did with the gun. She acknowledged telling the police that Ms. Williams was a "booster."

On cross-examination by Sullivan's counsel, Ms. Jones testified that a "booster" was "[s]omeone who steals and sells whatever they steal." She said that she went to the bus stop after the robbery because she was scared and that she did not telephone the police because Ms. Williams had already called them. She acknowledged having a prior conviction for aggravated burglary.

On cross-examination by the State, Ms. Jones testified that on the night of January 17, 2013, the appellant and another man discussed committing a robbery. Ms. Williams was not present during the conversation, and it did not involve robbing a specific person. On the afternoon of January 18, Ms. Williams, Ms. Jones, and Ms. Peters were in Ms. Williams's kitchen when Sullivan and the appellant entered the apartment. The appellant and Sullivan came into the kitchen, and Ms. Williams tried to get out the back door. However, Sullivan caught up with Ms. Williams and attacked her. Ms. Jones said that she did not see Sullivan hit Ms. Williams with a gun but that she saw blood. She acknowledged that both of the defendants had a gun during the robbery, that Sullivan's gun was chrome, and that the appellant's gun was black. She said that the appellant and Sullivan were asking Ms. Williams "about a gun, about money, and other things" and that the appellant told her to take a television outside. She said she did so because the appellant pointed his gun at her. Sullivan also threated Ms. Jones with a gun, and one of the robbers told Ms. Peters to take something outside. The appellant and Sullivan loaded items into the Explorer and drove away in the vehicle. The robbery lasted ten to twenty minutes.

Detective Andrew Davis of the MNPD testified for the appellant that he was the case officer for this case and that a check on the gun recovered by Officer Weir revealed the gun had been reported stolen in California. Defense counsel then called Charmaine Peters to the stand. Upon being questioned by counsel for Sullivan, Ms. Peters testified that she was from Los Angeles, California. She said that on the day of the robbery, the appellant and Sullivan entered Ms. Williams's apartment through the front door. She saw one gun, and it was chrome.

At the conclusion of the proof, the jury convicted the appellant and Sullivan of the aggravated robbery of Ms. Williams, a Class B felony, and aggravated burglary, a Class C felony. The jury acquitted them of the aggravated assaults of Ms. Jones and Ms. Peters. After a sentencing hearing, the trial court sentenced the appellant as a Range II offender to fifteen years to be served at eighty-five percent release eligibility for aggravated robbery and as a Range II, multiple offender to eight years for aggravated burglary. The court ordered that the sentences be served concurrently.

## II. Analysis

The appellant claims that the evidence is insufficient to support his convictions. Regarding his aggravated robbery conviction, the appellant claims that fingerprint evidence fails to show that he held the gun used in the robbery.[2] As to his aggravated burglary conviction, the appellant claims that the State failed to show that he entered Williams's apartment. In support of that claim, he argues that his fingerprints were not found in the apartment and that the single print found on the television in Williams's Explorer was "unsurprising" because he was in the apartment the day before the robbery. The State contends that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

---

[2] As the State notes in its brief, the appellant actually contends that the evidence is insufficient to support his conviction of aggravated assault. However, the judgments of conviction and the sentencing hearing transcript reflect that the appellant was convicted of aggravated robbery. Thus, we will apply his argument as to aggravated assault to his conviction of aggravated robbery, both of which require the use or display of a deadly weapon. See Tenn. Code Ann. §§ 39-13-102(a)(1)(A)(iii), -402(a)(1).

- 6 -

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).  "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'"  State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in this case, aggravated robbery is a robbery accomplished with a deadly weapon.  Tenn. Code Ann. § 39-13-402(a)(1).  Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  Tenn. Code Ann. § 39-13-401(a).  A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent.  Tenn. Code Ann. § 39-14-103(a).  Aggravated burglary is burglary of a habitation.  Tenn. Code Ann. § 39-14-403(a).  Burglary occurs when a person, without the effective consent of the property owner, enters a building other than a habitation not open to the public with the intent to commit a felony, theft, or assault.  Tenn. Code. Ann. § 39-14-402(a)(1).

As to the appellant's claim that the evidence is insufficient to support his aggravated robbery conviction because it fails to show that he held the gun during the robbery, Ms. Williams testified that Sullivan and the appellant passed the gun to each other twice.  Moreover, Ms. Jones, the appellant's own witness, testified that both the appellant and Sullivan had guns during the robbery.  Determining the credibility of witnesses is within the purview of the jury, not this court.  See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier [ ] of fact").  In any event, the record reflects that the trial court instructed the jury on criminal responsibility.  "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both."  Tenn. Code Ann. § 39-11-401(a).  Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense."  Tenn. Code Ann. § 39-11-402(2); State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime.  It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.").

The evidence established that Sullivan used a gun during the robbery. From the evidence presented at trial, we conclude that a reasonable jury could have found the appellant guilty of the crime as the principle offender or under a theory of criminal responsibility. Therefore, the evidence is sufficient to support the aggravated robbery conviction.

As to the appellant's claim that the evidence is insufficient to support the aggravated burglary conviction because it fails to show that he entered Williams's apartment, all three of the eyewitnesses, i.e., Williams, Jones, and Peters, testified that the appellant entered the apartment with Sullivan. The jury clearly resolved the issue of credibility of the witnesses in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000).

## III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE